[Civ. No. 31649.   Second Dist., Div. Five.   Sept. 23, 1968.]

JOHN SCHAAF, Plaintiff and Appellant, v. F. H. BEATTIE et al., Defendants and Respondents; HOMER C. THOMPSON et al., Interveners and Respondents.

John M. Sink for Plaintiff and Appellant.

Robert K. Cutler, County Counsel, Dana A. Smith, Acting County Counsel, Thomas P. Anderle and Melbourne B. Weddle, Deputy County Counsel, for Defendants and Respondents.

Schramm, Raddue & Seed, Thomas J. Greene and Dale E. Hanst for Interveners and Respondents.

AISO, J. pro tem.*—The petitioner John Schaaf sought a writ of mandamus to compel the defendant (respondent) J. E. Lewis, County Clerk and Registrar of Voters of Santa Barbara County, to certify that a referendum petition to submit Santa Barbara County Ordinance No. 1473 to the voters of that county filed by him on September 29, 1966. had attached to it the requisite number of signatures of registered qualified voters of that county. He appeals from the judgment denying the writ and discharging the alternative writ theretofore issued.

*Issue on Appeal*

The sole issue before us is: In checking a referendum petition pertaining to a county ordinance for the requisite number of signatures, may the county clerk[1] reject the signature of a person whose address appearing on the petition differs from the address and precinct shown on his affidavit of registration? Our conclusion is, "Yes, he may" for the reasons set forth below.

*The Factual Background*

The facts are undisputed. Ordinance No. 1743, purporting

---

*Assigned by the Chairman of the Judicial Council.
[1]Includes registrar of voters where applicable.

to change the zoning classification of an area within the unincorporated portion of Santa Barbara County was adopted by the board of supervisors of that county on August 29, 1966. Within a 30-day period following the adoption of that ordinance, the referendum petition here involved was circulated. It was filed with the county clerk's office on September 29, 1966, with 6,976 purportedly qualified signatures attached thereto.

The total number of votes cast in Santa Barbara County at the last gubernatorial election prior to the circulation and filing of the petition totaled 64,052. The petition, therefore, required a minimum of 6,405 signatures of registered qualified voters[2] to put the measure on the ballot.

Defendant (respondent) J. E. Lewis, county clerk and registrar of voters, and his deputies duly examined the petition, and Lewis determined 720 signatures were not qualified, thereby reducing the total number of qualified signatures on the petition to 6,256. This number was 149 short of the required 6,405.

Of these 720 signatures declared as being invalid, a net total of 230 consisted of signatures of persons for whom no affidavit of registration on file corresponded to either the respective addresses or precincts designated in the referendum petition for such persons. Disqualification of the other 490 signatures on other grounds is not challenged here.

In making his determination, Lewis and his deputies limited themselves to the information contained in the petition and the signer's "original affidavit of registration current and in effect on the date indicated as the time of signing" (Elec. Code, § 46). Lewis then issued and filed his "Certificate of Insufficiency" on October 7, 1966, stating therein that there were only 6,256 "signatures of registered, qualified electors" on the petition.

The modus operandi of Lewis' office in checking the valid-

[2]Elections Code, section 3752: "If a petition protesting against the adoption of an ordinance is presented to the board of supervisors prior to the effective date of the ordinance, the ordinance shall be suspended and the supervisors shall reconsider the ordinance. The petition shall be signed by voters of the county equal in number to at least 10 per cent of the entire vote cast within the county for all candidates for Governor at the last gubernatorial election."

California Constitution, article IV, section 1, prior to its repeal and reenactment on November 8, 1966 (hereafter referred to only as Const., art. IV, § 1), provided in part: "The . . . referendum powers of the people are hereby further reserved to the *electors* of each county . . . to be exercised under such procedure as may be provided by law . . . but shall not require . . . more than *10 per cent* of the *electors* thereof to order the referendum . . ." (Italics added.)

ity of signatures was explained through the testimony of Myrtle Heltman, deputy county clerk. The original affidavit of registration of each voter is put in precinct books in alphabetical order.[3] There is also a precinct book which lists all the streets alphabetically; it "tells what numbers fall within a certain precinct on [a] particular street." The duplicate .(pink) copies are all filed in alphabetical order in a separate master file so that the clerk's office has a master alphabetical list of all the registered voters of the county as well.[4] In checking the signatures, the deputies first go to the "circulator" and then to the precinct books. If an affidavit for a particular person is not found in the precinct within which the address written by the signer on the petition falls, then a check is made of the county wide alphabetical list[5] to ascertain whether his affidavit might have been misfiled, or whether he is registered to a different address within the county. If the address on the petition corresponds to the registered address, but a wrong precinct designated, the clerk's office rectifies the error by inserting the proper precinct, and counts the signature as valid. Likewise, a change of address within the same election precinct is not deemed a disqualification.

## Discussion of Issue

"Although it is the general rule that referendum provisions are to be liberally construed in favor of the reserved power, it is settled that consideration must also be given to the consequences of applying the rule. [Citations.]" (*Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839 [313 P.2d 545].)

---

[3] Elections Code, section 422: "Prior to any election the county clerk shall arrange the original affidavits of registration for each precinct in which the election is to be held, alphabetically by surnames in each precinct, and bind them into books with an alphabetical index. Each book shall be marked on the outside with the name or number of a precinct, and shall contain all, and only, the original affidavits of registration of voters residing within the precinct."

[4] Elections Code, section 423: "Duplicate affidavits of registration for the whole county of each county shall, as fast as the registration progresses, be filed alphabetically without regard to precinct. The aphabetical arrangement shall be exact. In the cases of voters having the same surname, the classification shall extend to the given and, where necessary, the middle name or initial."

[5] Benjamin Hite, Registrar of Voters in Los Angeles County, testified that the practice of his office was to check the precinct book for the original affidavit. If no affidavit is found in the precinct book for the address or precinct designated on the referendum petition, no further check is made.

Robert L. Hamm, County Clerk and Recorder of Ventura County, testified that the practice of his office was the same as that of Santa Barbara County.

Article IV, section 1 of the Constitution required that in a referendum petition: ''Each signer shall add to his signature his place of residence, giving the street and number if such exist. His election precinct shall also appear on the paper after his name.''

Section 45 of the Elections Code provides insofar as it is pertinent to this case: ''Whenever, by the Constitution or laws of this State, any . . . referendum . . . petition . . . is required to be signed by voters, *only a person who is a registered qualified voter at the time he signs the petition . . . is entitled to sign it.* Each signer shall at the time of signing the petition . . . personally affix the date of signing and his place of residence, giving street and number, and if no street or number exists, then a designation of his place of residence which will enable the location to be readily ascertained . . .'' (Italics added.)

■ The word ''residence'' used in connection with **the** right of a person to vote means ''legal residence'' or domicile. (*Huston* v. *Anderson* (1904) 145 Cal. 320, 328 [78 P. 626].)

Section 46 of the Elections Code provides: ''Whenever, by the Constitution or laws of this State, the county clerk is required to determine what number of voters have signed any petition or paper, the petition or paper, when filed with the officer, shall have designated therein the *name or number of the respective precinct in which each of the signers reside.* The county clerk shall determine that fact with respect to the purported signature of any voter *from his original affidavit of registration current and in effect on the date indicated as the time of signing.*'' (Italics added.)

It has been held that since the provisions of article IV, section 1 of the Constitution are self-executing as expressly stated therein, the registrar of voters need not accept the petition if no precinct numbers appear on the petition. (*Mayock* v. *Kerr* (1932) 216 Cal. 171, 173 [13 P.2d 717].) The court there stated: ''Inasmuch as the Constitution plainly requires this information to appear on the petition it is needless to speculate as to why the framers of the Constitution saw fit to insert this limitation on the exercise of the right. The provision was probably inserted as a mechanical aid to the Registrar of Voters in investigating, identifying and verifying the persons and signatures of the purported signers.'' (Cf. *Gerth* v. *Dominguez* (1934) 1 Cal.2d 239, 244 [34 P.2d 135].) The same rationale applies to the residence require-

ment. (See Elec. Code, § 45, *supra*; *Martin* v. *Board of Trustees* (1929) 96 Cal.App. 705, 706 [274 P. 1015].) Residence is also a part of the qualifications of an elector. (See discussion *infra*.)

Article IV, section 1 of the Constitution also provides in part here relevant: "Within 20 days after the filing of such petition in his office the said clerk, or registrar of voters, shall determine from the records of registration what number of qualified electors have signed the same . . ." As noted above section 46 of the Elections Code explicitly directs the check to be made against the "original affidavit of registration current and in effect on the date indicated as the time of signing." In *Williams* v. *Gill* (1924) 65 Cal.App. 129, 132 [223 P. 559], it is stated: "The clerk is not clothed with authority to receive extraneous evidence of the contents of a petition. His certificate is only required to show the result of an examination whereby, 'from the records of registration,' he has ascertained whether or not the petition is signed by the requisite number of qualified voters." (See also *Boggs* v. *Jordan* (1928) 204 Cal. 207, 215 [267 P. 696]; *Martin* v. *Board of Trustees* (1929) *supra*, 96 Cal.App. 705, 707; *Ratto* v. *Board of Trustees* (1925) 75 Cal.App. 724, 726 [243 P. 466].) In fact, it has been held error to go outside the registration records to ascertain the qualifications of either signers or circulators under a municipal charter provision. (*Ley* v. *Dominguez* (1931) 212 Cal. 587, 602 [239 P. 713].)

Where the address written by a signer of a petition differs from the address and precinct shown on his original affidavit of registration, there is a disclosure that the signer as of the date of his signing was not a resident of his election precinct. It immediately raises the question: "Was he 'a registered qualified voter at the time he sign[ed] the petition'?" (Elec. Code, § 45, *supra*.)

█ A voter is an elector registered[6] under the provisions of the Elections Code (§ 21). " 'Elector' means any person who qualifies under section 1 of Article II of the Constitution of this state." (Elec. Code, § 20.) █ "A *registered*, qualified elector . . . is a person who possesses the constitutional qualifications and is registered in accordance with the registration statute." (Italics in original.) (*Minges* v. *Board of*

[6] "The Constitution does not prohibit the enactment of laws, either by the legislature or by the people by means of the initiative, which require electors to register as a condition precedent to their exercising the privilege of voting and to provide for reasonable methods of registration." (*McMillan* v. *Siemon* (1940) 36 Cal.App.2d 721, 729 [98 P.2d 790].)

*Trustees* (1915) 27 Cal.App. 15, 18 [148 P. 816].) ''The qualifications of electors stated in article II, section 1, of the state Constitution include residence in the election precinct.'' (*Garrison* v. *Rourke* (1948) 32 Cal.2d 430, 441 [196 P.2d 884].) To this rule, the aforementioned section of the Constitution provides an exception or a period of grace in case of a change of residence to a different election precinct which is pertinent: ''. . . any person duly registered as an elector in one precinct and removing therefrom to another precinct in the same county within 54 days . . . prior to an election, shall for the purpose of such election be deemed to be a resident and qualified elector of the precinct . . . from which he so removed until after such election . . .''

Under this proviso, it is conceivable that even though the residence of a signer reflected by the petition differs from the address and precinct shown in his original affidavit of registration, he is still both a registered and qualified voter if his change of residence occurred within less than 54 days prior to the next election. Conversely, if the removal occurred more than 54 days before such election date, such person is no longer a registered qualified voter. He may be registered in his old precinct, but he is not a qualified elector therein. In the precinct of his new residence, he may be a qualified elector, but he is not registered. The date of change of residence, therefore, is the critical factor. This cannot be determined without going outside of the records of registration, which the county clerk is prohibited from doing.

The county clerk in eliminating the 230 signatures for which he could find no original affidavit of registration specifying the address on the petition or in the precinct in which such address would fall, properly performed his duties, which are ministerial only (*Boggs* v. *Jordan* (1928) *supra,* 204 Cal. 207, 215).[7]

The result we reach comports with promoting certainty as to the signatures certified as valid and with the ancillary purpose of requiring addresses and precinct numbers on referendum petitions, namely, to facilitate the work of the

---

[7]Even if we be wrong in our views herein delineated, no miscarriage of justice occurred in this case. By tally of the dates of signature alongside the 230 signatures rejected, Myrtle Heltman, deputy county clerk, ascertained that 106 fell on or before September 15, 1966, which would place those dates as being more than 54 days prior to the ''next succeeding election,'' which was to be held on November 6, 1966. The remaining 124 dates fell on September 16 or later. Circulation of the petition ended on September 28, 1966. Even if these 124 had been counted as valid, the count would not have reached the minimum number required, as 149 more signatures were needed.

county clerk in determining the number of valid signatures within the 20-day period in which he is required to complete his work (Cal. Const., art. IV, § 1.) No one is arbitrarily disenfranchised under this disposition: For purposes of exercising voting rights, there is no legal impediment to those who would be beneficiaries of the 54-day grace period provided by article II, section 1 of the Constitution, giving their old residence address at which they were registered. (*Ley* v. *Dominguez* (1931) *supra,* 212 Cal. 587, 593.) Those who fall on the other side of the line can reregister under their new address before signing the petition. (Elec. Code, §§ 321, 380; *Perham* v. *City of Los Altos* (1961) 190 Cal.App.2d 808, 809 [12 Cal. Rptr. 382].)

The form for the affidavit of registration set forth in section 321 merely requires the affiant to state that "at the time of the next succeeding election" the affiant will be "a resident . . . of the precinct 54 days next preceding such election." Subdivision 1 of that section also reads in part: "1. I am not now registered as a voter in this State. (If now registered in this county under this or another name, mark out the word 'not' and fill out transfer clause at top. . . .)" Section 315 of the Elections Code provides: "The county clerk may cause to be written or printed upon the top margin of the affidavit, in addition to any matter provided for in this code, any words necessary or convenient to designate the precinct, district, or political subdivision for which the affidavit is taken, or to indicate any removal or transfer of registration. Any other reasonable memoranda may be added which is necessary or convenient to enable the county clerk to perform his duties in assorting or classifying or handling affidavits with correctness and dispatch." Section 380 also provides in part: "A certified copy of an uncanceled affidavit of registration is prima facie evidence that the person named in the entry is a voter of the county." Hence, the statutory scheme does provide a plan whereby persons in the situation represented by the 230 signatures rejected can protect themselves because all of the necessary information can be put into the registration records from which the county clerk can make his check as directed by section 46 of the Elections Code.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 20, 1968.